**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| LINDA R. TRIPP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 01-157 |
| v. | ) | (EGS) [48-1] |
| | ) | |
| | ) | **FILED** |
| DEPARTMENT OF DEFENSE, | ) | |
| *et al.*, | ) | SEP 3 0 2003 |
| | ) | |
| Defendants. | ) | NANCY MAYER WHITTINGTON, CLERK |
| | ) | U.S. DISTRICT COURT |

<u>**MEMORANDUM OPINION AND ORDER**</u>

In this action, plaintiff Linda Tripp alleges that the
United States Department of Defense ("DOD") violated the Privacy
Act, 5. U.S.C. §552a (2003), as well as the Administrative
Procedures Act ("APA"), 5 U.S.C. §551 *et seq.* (2003) and 5
U.S.C. §701 *et seq.* (2003), by releasing information related to
her application for employment at the George Marshall Center in
Germany to the Department of Defense publication *Stars and
Stripes*. The issue now before the Court is whether Ms. Sandra
Jontz, a reporter for the DOD Armed Forces Newspaper *Stars and
Stripes*, is entitled to invoke the "reporter's privilege" in
response to plaintiff's discovery requests regarding her
sources for the article at issue.

**I. BACKGROUND**

The facts of this case are set forth in detail in this Court's March 30, 2002 Memorandum Opinion and Order granting in part and denying in part defendants' motion to dismiss. *Tripp v. Dept. of Def.*, 193 F. Supp. 2d 229 (D.D.C. 2002). Accordingly, only those facts pertinent to the issue presently before the Court are summarized here.

In or about October 2000, Plaintiff applied for a position as Deputy Director of the Conference Center at the George C. Marshall European Center for Security Studies, a Department of Defense research and training institute located in Gamusch, Germany.[1] Several months after she submitted her application, plaintiff was notified that she had been certified as one of the top qualified applicants for the position. She subsequently contacted the Marshall Center by telephone to inquire as to the job application process, and spoke to Mr. Robert Kennedy, the Marshall Center Director. Plaintiff contends that during that

---

[1] At the time of her application for employment at the Marshall Center, plaintiff was employed with the Office of Public Affairs at DoD. Because plaintiff was a non-career, Schedule C political appointee, she was terminated from this position on January 20, 2001, at the conclusion of the Clinton administration.

conversation she did not give Mr. Kennedy or anyone else the authority to disclose to any third parties information related to her job application.

Plaintiff was scheduled for an interview at the Marshall Center on January 23, 2001. When she arrived at the Center, she was handed a copy of that day's *Stars and Stripes* newspaper, which featured an article titled "Linda Tripp up for Job at Marshall Center" and authored by Ms. Jontz. *See* Pl.'s Opp. to Def.'s Mot. to Dismiss, Ex. 2, Sandra Jontz, *Tripp to Interview at Marshall Center*, STARS AND STRIPES, at 2 (January 23, 2001). Plaintiff alleges that this article was published in the European and Pacific print editions of *Stars and Stripes*, the on-line edition of the European edition of *Stars and Stripes*, and in the electronic "Early Bird" on-line and e-mail publication distributed by DoD. In the article Jontz identified a number of sources, including: unnamed "center officials;" Marshall Center Director Robert Kennedy; an unnamed "Pentagon spokeswoman;" and unnamed "sources close to the Center." *Id.* Ultimately, plaintiff was not selected for the Deputy Director position at the Marshal Center.

Plaintiff commenced this action on January 25, 2001, alleging that DOD officials violated her Privacy Act rights by disclosing information contained in a Privacy Act system of

records to *Stars and Stripes*.  Plaintiff also claims that DOD
failed to make necessary efforts to ensure the accuracy of the
released information, to establish adequate rules for personnel
with respect to the Privacy Act, and to establish sufficient
safeguards to prevent unauthorized disclosures.  Finally,
Plaintiff asserts an APA claim premised on the alleged
violation of a January 6, 2000 "reverse FOIA request" to DOD,
in which she requested that "no information be released to the
news media directly or indirectly related to Mrs. Tripp, unless
that information is properly requested under" the FOIA, and
plaintiff is first given the opportunity to review any files
prior to their release.

On July 25, 2002, Tripp served a notice of deposition and
request for documents on Defendant DOD, seeking the production
of DOD-employee Sandra Jontz for deposition testimony, as well
as Jontz' notes, sources' names, drafts, and any document
relating directly or indirectly to Linda Tripp. *See* Jontz' Mot.
for a Protective Order ("Jontz' Mot."), Ex. A, Dep. Notice and
Doc. Request Regarding Sandra Jontz.  The DOD postponed the
deposition on several occasions on the grounds that Ms. Jontz
was unavailable, as well as to provide the DOD the opportunity
to determine whether it wanted to file a motion for a
protective order. Pl.'s Notice of Filing at 1-3.  On September

19, 2002, the DOD proposed an October 30, 2002 deposition date, which it believed would provide sufficient time for it to file any objections to the discovery request if it chose to do so, and give the court sufficient time to issue a ruling on any objection made. *Id.* The DOD subsequently informed plaintiff by letter received after an October 7, 2002 status hearing in this case, that DOD was asserting "the reporter's privilege" with respect to "any information relating to Ms. Jontz' newsgathering sources" for the *Stars and Stripes* article at issue.

On October 22, 2002, Ms. Jontz, who is not a party to this action, filed a motion for a protective order pursuant to Fed. R. Civ. P. 26(c), officially objecting to Plaintiff's discovery request. Jontz' Mot. at 1.  In so doing, Jontz asserted the "reporter's privilege" with respect to Plaintiff's discovery of "any information relating to Ms. Jontz' newsgathering sources for the January 23, 2001 *Stars and Stripes* article at issue" without "first attempting to obtain discovery from alternate sources," and further requested that plaintiff withdraw the discovery request. *Id.*  Failing that, Jontz asks the Court for a protective order barring plaintiff from seeking discovery regarding her newsgathering activities.  In support of her motion, Jontz alleged that the DOD had offered Plaintiff the

opportunity to depose Lt. Col. Michael Glenn ("Glenn"), an
employee of the Marshall Center in Germany, as an alternative
to deposing Jontz.  *Id.* at 8-9.

Plaintiff then filed a motion requesting that this Court
order the DOD to produce Jontz for deposition testimony, *see*
Pl.'s Notice of Filing, and turn over all documents relating to
the *Stars and Stripes* article in question. Def.'s Notice of
Filing at 10.  It is plaintiff's contention that the DOD cannot
assert the "reporter's privilege" because Jontz violated the
Privacy Act when she used her position as a DOD employee to
obtain information about Tripp's Marshall Center employment
application from plaintiff's confidential personnel records. *Id.*
at 7-8. Prior to attempting to depose Ms. Jontz, plaintiff had
not engaged in any discovery with respect to her Privacy Act
claim. Jontz' Mot. at 1. Since the motion for a protective order
was filed, plaintiff has deposed Lt. Col. Glenn, and has
submitted written discovery requests to both the DOD and Office
of Personnel Management ("OPM") requesting any information
regarding employment applications contained in a system of
records. Def.'s Settlement Statement at 2.

II.        **First Amendment "Reporter's Privilege"**

The Federal Rules of Civil Procedure provide that "parties
may obtain discovery regarding any matter, not privileged,

which is relevant to the subject matter involved in the pending action," reflecting the "fundamental principle that . . . the public has a right to know every [person's] evidence," Fed. R. Civ. P. 26(b)(1); *see Huitra v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 117 (D.D.C. 2002). Under the First Amendment, reporters enjoy a qualified privilege against compelled disclosure of sources and information obtained through news gathering activities.[2] *Clyburn v. News World Communications,*

---

[2] The District of Columbia's "Free Flow of Information Act of 1992," applicable in diversity actions, provides statutory protection to members of the news media. It provides, in relevant parts:

> no judicial . . . body . . . shall compel any person who is or has been employed by the news media and acting in an official news gathering or news disseminating capacity to disclose:
> (1) The source of any news or information procured by the person while employed by the news media and acting in an official news gathering capacity, whether or not the source has been promised confidentiality . . .

> [except]

> if the court finds that the party seeking the news or information established by clear and convincing evidence that:
> (1) The news or information is relevant to a significant legal issue before a judicial . . . body;
> (2) The news or information could not, with due diligence, be obtained by any alternative means;
> (3) There is an overriding public interest in the disclosure.

D.C. Code Ann. §§ 16-4702 - 16-4704 (2002); *Grunseth v. Marriott Corporation*, 868 F. Supp. 333, 336 (D.D.C. 1994).

*Inc.*, 903 F.2d 29, 35 (D.C. Cir. 1990); *Zerilli v. Smith*, 656

F.2d 705, 711 (D.C. Cir. 1981) *Huitra v. Islamic Republic of*

*Iran*, 211 F. Supp. 2d at 118; *Blumenthal v. Drudge*, 186 F.R.D.

236, 244 (D.D.C. 1999). While the D.C. Circuit has never ruled

directly on the issue, other Circuits, as well as District

Courts within this Circuit, have concluded that the qualified

"reporter's privilege" protects both confidential and non-

confidential information obtained by the reporter during the

course of the reporter's newsgathering efforts. *See Hutira*, 211

F. Supp. 2d at 121-122; *NLRB v. Mortenson*, 701 F. Supp. 244,

247 (D.D.C. 1988); *see also Gonzales v. NBC, Inc.*, 194 F.3d 29,

33-36 (2d. Cir. 1999); *United States v. LaRouche*, 841 F.2d

1176, 1182 (1st Cir. 1988).  One District Court has held that

the privilege protects not only the sources of a reporter's

information, but also a reporter's notes, diaries, and any other

material generated in connection with the editorial process.

*See Maughan v. NL Indus.*, 524 F. Supp. 93, 95 (D.D.C. 1981).

Although the reporter bears the burden of demonstrating the

applicability of the privilege, *Hutira*, 211 F. Supp. 2d at 120-

121, "in the ordinary case the civil litigant's interest in

disclosure should yield to the journalist's privilege." *Zerilli*,

656 F.2d at 712. "The privilege is not absolute, however, and

may be abrogated upon sufficient showing by the party seeking the information." *Huitra v. Islamic Republic of Iran*, 211 F. Supp. 2d at 118.  Once a court determines that the reporter's privilege is properly invoked, it must "look to the facts of the particular case, balancing 'the public interest in protecting the reporter's sources against the private interest in compelling disclosure.'" *Id*. at 118-119. The following factors are to be considered when deciding whether to uphold the privilege:

1) whether the information sought "goes to the heart of" the case;

2) efforts made by the party seeking disclosure to obtain the information from an alternative source and the availability of the information from such an alternative source;

3) whether the journalist from whom disclosure is sought is a party to the action;

4) whether the information sought is confidential or non-confidential in nature.

*See id*. at 119, 120. In assessing claims of "reporter's privilege" "[courts] will be mindful of the *preferred position* of the First Amendment and the importance of a rigorous press," *Zerilli*, 656 F.2d at 711-12; *Grunseth v. Marriott Corp.*, 868 F. Supp. at 335.

Before turning to consideration of these factors, however, the Court must first determine whether *Stars and Stripes* is the

9

type of publication to which the reporter's privilege is intended to apply, and whether Ms. Jontz is a journalist as that term is used in the relevant jurisprudence.

A.    *Status of Stars and Stripes*

In her response to Ms. Jontz' motion, plaintiff argues that the *Stars and Stripes* does not qualify as a "newspaper,"[3] and thus its employees are not entitled to First Amendment protections, including the right to assert the "reporter's privilege." Pl.'s Notice of Filing at 3.  Plaintiff specifically alleges that *Stars and Stripes* is a government-controlled internal information organization under the control of, and operated by, the employees of the DOD, and therefore cannot invoke First Amendment protections reserved for the "press." Pl.'s Notice of Filing at 3. Therefore, Plaintiff alleges that Jontz, as an employee of *Stars and Stripes*, is not entitled to invoke the "reporter's privilege" to avoid Plaintiff's discovery request. *Id.* at 4-6.  DOD responds that, although *Stars and Stripes* is published by the DOD and its audience consists primarily of members of the "armed forces community," it is

---

[3] Generally speaking, there are two types of newspapers available on military bases: Armed Forces Newspapers, which are published and financed by the military, and Civilian Enterprise Newspapers, which are published by commercial civilian publishers. *M.N.C. of Hinesville, Inc. v. DOD*, 791 F.2d 1466, 1468-1469 (11th Cir. 1986).  *Stars and Stripes* is an Armed Forces Newspaper with over 280,000 daily readers in over 40 countries. Mazarella Aff. ¶ 4.  Its articles also appear on the *Stars and Stripes* World Wide Web site, and are electronically distributed to United States Navy ships

also "every bit a newspaper in the traditional sense," and as such enjoys "the full protection of the First Amendment." Mot. for Protective Order at 2.

The Supreme Court has long held that the notion of the "press" should be given a broad meaning, stating that "the press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." *Lovell v. City of Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666 (1938).  The D.C. Circuit has never directly addressed the question of whether *Stars and Stripes* is a publication protected by the First Amendment. Nor has it provided any guidance as to what characteristics should bring a publication within the scope of the First Amendment. Nevertheless, it appears that, as a general rule, courts refer to *Stars and Stripes* as a newspaper, or more generally as part of the "media." *See United States v. New*, 50 M.J. 729, 734 (U.S. Army Crim. App. 1999) (referring to the *Stars and Stripes* "newspaper"); *United States v. Creer*, No. NMCM96-00469, 1997 WL 658741, at *2 (N.M. Crim. App. Apr. 9, 1997) (unpublished opinion) (referring to the *Stars and Stripes* when discussing "newspaper" coverage of an event damaging to the military's

---

deployed at sea. *Id.*

11

reputation in Japan); *United States v. Grzeganek*, 841 F. Supp. 1169, 1170 (S.D. Fl. 1993) (referring to the *Stars and Stripes* along with *USA Today*, the *International Herald Tribune*, *CNN*, and the *New York Times* as the "media"); *Freedman v. Turnage*, 646 F. Supp. 1460, 1461 (W.D.N.Y. 1986).

Plaintiff cites no authority supporting her position with respect to *Stars and Stripes* First Amendment "status," as it were, instead relying entirely on statements made on the DOD World Wide Web site regarding the role of the American Forces Information Services ("AFIS"). Essentially, Plaintiff's argument is that because the AFIS' primary goal is to "promote and sustain individual and unit military readiness, quality of life, and morale throughout the Department of Defense," any employee working for an AFIS publication is necessarily not entitled to the First Amendment protections afforded to reporters engaged in objective "newsgathering."[4]

Jontz responds that the *Stars and Stripes* is "much the same as any other commercial newspaper" and therefore qualifies for First Amendment protections. Jontz' Mot. at 4. Jontz correctly

---

[4] While this argument fails in light of the recent legislative history and DOD directives requiring *Stars and Stripes* to function as a commercial newspaper, the government, in *M.N.C.*, made a similar argument in relation to a First Amendment claim. 791 F.2d at 1471. In *M.N.C.*, while attempting to limit the freedom of the press, the government argued that an Armed Forces Newspaper is not covered by the First Amendment because it is simply an internal distribution medium used by the military to disseminate information it thought necessary for the troops to receive. *Id.*

points out that both the DOD and Congress intend for the *Stars and Stripes* to operate like other commercial newspapers, and enjoy First Amendment protections and prohibitions.  While it is true that *Stars and Stripes* is within DOD control, the legislative history of the National Defense Authorization Act reveals that Congress intended the information gathered by editors and reporters and published in *Stars and Stripes* to be free of interference from the DOD chain of command, provided it is balanced, accurate, and of interest to the readership. Report of the Committee on Armed Services, House of Representatives, on the National Defense Authorization Act for Fiscal Years 1990-1991, H.R. 2461, Report 101-121 (July 1, 1989).  Moreover, Congress has expressly stated that articles in *Stars and Stripes* should "enjoy the full protection of the First Amendment, and military personnel on the frontiers of freedom must enjoy their first amendment rights." *Id.* Additionally, the DOD directive establishing the procedures and assigning the responsibilities for *Stars and Stripes* states:

> The *Stars and Stripes* is an unofficial, abstracted collection of commercial news and opinion available to commercial newspapers in the United States, [and also contains] *Stars and Stripes* editorial staff-generated DOD, command, and local news and information.  The *Stars and Stripes* provides this information to the members of the Department of Defense and their family members serving

---

13

overseas, as do commercial daily newspapers that are published and sold throughout the United States in keeping with the principles of the First Amendment of the U.S. Constitution. DOD Directive 5122.11, § 4.6.2 (Oct. 5, 1993).

The DOD's intent is further evidenced by DOD directives stating that "the *Stars and Stripes* does not represent the official position of the U.S. government, the DOD, or the Unified Combatant Command," and that *Stars and Stripes* reporters enjoy no special access to the military. Jontz' Response at 2, (citing DOD Directive 5122.11, Enclosure 6), *id.* at 3 (citing DOD Directive 5122.11, ¶ 5.2).

While the Plaintiff is correct when she alleges that the *Stars and Stripes* is owned and controlled by the DOD and "operated by AFIS, the principal internal information organization within the DOD, the Director of AFIS' responsibilities do not extend to the editorial operations of *Stars and Stripes*. Jontz' Mot. at 3 (citing DOD Directive 5122.11, ¶ 5.2 (Oct. 5 1993)), *id.* at 4. Furthermore, the current *Stars and Stripes* Editorial Director has stated in a sworn affidavit that *Stars and Stripes* is editorially independent, largely financially independent, and is often the only source of uncensored information about the military available to service members. Mazzarella Aff. ¶ 2, 13 (citing DOD Directive 5122.11, §4.2 (Oct. 5 1993) (stating that

14

"[e]ditorial policies and practices of the *Stars and Stripes*
shall be in accordance with journalistic standards governing
U.S. daily commercial newspapers of the highest quality . . .
.")).

The relevant case law, recent legislative history, recent
DOD Directives, and affidavit of *Stars and Stripes* Editorial
Director all support Jontz' contention that the *Stars and
Stripes* and its employees should be afforded First Amendment
protections. In the absence of any authority to the contrary,
the Court concludes that *Stars and Stripes* is a newspaper for
the purposes of First Amendment analysis.

B.      *Jontz' Right to Invoke the Reporter's Privilege*

Plaintiff next submits that Jontz, as an employee of the
DOD, is not entitled to invoke the "reporter's privilege." *Id.*
at 7. However, the D.C. Circuit has held that the "'reporter's
privilege' must encompass all newsgathering efforts, not simply
those for newspapers." *United States v. Hubbard*, 493 F. Supp.
202, 205 (D.C. 1979). Since *Hubbard*, a District Court within
this Circuit has held, in a case involving a publisher and
editor of a bi-weekly newsletter, that:

> the protections which the First Amendment extends to
> newsgathering activities are not restricted to those who
> identify themselves as journalists by education, employment,
> or other such criteria . . . the privilege is not limited to
> the writers of large established newspapers and media

> enterprises but is equally applicable to the sole publisher
> of a newsletter or other writing or paper distributed to the
> public to inform, to comment, or to criticize...

*Liberty Lobby, Inc. v. Rees*, 111 F.R.D. 19, 20 (D.D.C. 1986).

In holding the privilege to be applicable on the facts before

it, the court relied on evidence of ongoing publishing and

distribution of the newsletter for "many years" and the

recognition of its publisher and editor as a journalist by

others. *Id.* at 21.

While this Circuit has not articulated a standard to be

applied when an individual's actions rise to the level of

"newsgathering" for purposes of entitling the reporter to assert

the "reporter's privilege," recent District Court opinions have

expressed support for a test adopted in the Third and Ninth

Circuits under which, in order to invoke the privilege, a

reporter must demonstrate that (1) the information was obtained

for the purpose of dissemination to the public; and (2) the

reporter had this intent at the time the information was

obtained. *Hutira*, 211 F. Supp. 2d at 120-121 (citing *Shoen v.

Schoen*, 5 F.3d 1289, 1293-1294 (9th Cir. 1993)); *Alexander v.

F.B.I.*, 186 F.R.D. 21, 49-50 (D.D.C. 1998); *see also Madden v.

Turner Broadcasting Systems, Inc.*, 151 F.3d 125, 129-130 (3d

Cir. 1998). One D.C. District Court has described the intent-

based test as follows:

whether a person is a journalist, and thus protected by the
privilege, must be determined by the person's intent at the
inception of the information-gathering process . . . the
individual claiming the privilege must demonstrate, through
competent evidence, the intent to use material – sought,
gathered, or received – to disseminate information to the
public and that such intent existed at the inception of the
newsgathering process. This requires an intent-based factual
inquiry to be made by the district court . . . prior
experience as a professional journalist may be persuasive
evidence of present intent to gather for the purpose of
dissemination . . . the primary relationship between the one
seeking to invoke the privilege and his sources must have as
its basis the intent to disseminate the information to the
public garnered from that relationship.

*Alexander v. FBI*, 186 F.R.D. at 50 (quoting *von Bulow v. von
Bulow*, 811 F.2d 136, 142, 144-45 (2d Cir. 1987)). However, in
none of these cases was it alleged that the publication or
journalist asserting the privilege was associated with any
government agency. One sister District Court has also found
that a person's prior experience as a professional journalist is
persuasive evidence of present intent to gather for the purpose
of dissemination. *Alexander*, 186 F.R.D. at 50.

It appears from the record now before the Court that Jontz
engaged in newsgathering while preparing the Tripp article.
The article itself indicates that Jontz interviewed a number of
individuals while researching Tripp's employment with the DOD
and her application to the Marshall Center, an activity which
is a "fundamental aspect" of investigative journalism. *See Mgmt.
Info. Tech., Inc. v. Alyeska Pipeline Serv. Co.*, 151 F.R.D.

471, 476 (D.D.C. 1993).  Moreover, plaintiff's own document request suggests that Jontz engaged in traditional newsgathering activities such as keeping notes. Additionally, it is beyond dispute that Jontz' article qualifies as a "writing distributed to the public to inform." *See Liberty Lobby*, 111 F.R.D. at 20.   Therefore, Jontz' duties at *Stars and Stripes* appear to fall within the scope of "newsgathering."

While Jontz has not directly alleged that she obtained information regarding Tripp's application with the intent to disseminate the information to the public, the fact that she was employed in a journalistic capacity is sufficient to meet her burden on this issue. *See Alexander v. FBI*, 186 F.R.D. at 50.  Jontz has engaged in traditional journalistic activities as a reporter for *Stars and Stripes*, an organization whose sole purpose is to disseminate commercial news and information to individuals involved in the military. Mazzarella Aff. ¶¶ 6-13. Plaintiff offers no alternative explanation, nor is any explanation found in the record, for why Jontz would have obtained information regarding Tripp's Marshall Center application. Accordingly,  this Court finds that Jontz' efforts during her research for the Tripp article were "newsgathering activities" for which she is entitled to invoke the "reporter's privilege."

Plaintiff maintains that such a finding is not dispositive, arguing that, notwithstanding the existence of the privilege, Jontz violated the Privacy Act by using her position as an employee of the DOD to obtain information regarding Tripp's current employment with the DOD and application for the Marshall Center position, which she then kept in a system of records, i.e. her notes, and distributed to the public via the *Stars and Stripes* article. Pl.'s Notice of Filing at 7.  Without passing on its merits, this argument is irrelevant to the Court's determination of whether Jontz, as an employee of the *Stars and Stripes*, has a general right to assert the "reporter's privilege" with respect to sources and information she obtains during her newsgathering efforts.  It does have some relevance to the final question before the Court, namely whether Plaintiff's need for the information can overcome the qualified "reporter's privilege."

C.      *Balance of Interests*

In order for a party seeking discovery to overcome the "reporter's privilege" he or she must prove that (1) the information sought goes to the "heart of the matter;" and (2) that he or she has exhausted all reasonable alternatives available to him or her to obtain the information. *See*

*generally Zerilli*, 656 F.2d at 704-706; *Hutira*, 211 F. Supp. 2d at 119; *Tavoulareas v. Piro*, 93 F.R.D. 11, 16 (D.D.C. 1981).

The Court need not engage in an exhaustive analysis of the public and private interests at stake in this case. As a general rule, no matter how strongly the other factors weigh in favor of the party seeking news gathering information from a journalist, where, as here, the party seeking to compel disclosure has made no effort whatsoever, or insufficient efforts, to obtain the information sought from alternative sources, or has made conclusory claims that the information cannot be obtained from other sources, courts in this Circuit have uniformly upheld the reporter's privilege and refused to compel disclosure of information related to news gathering activities. *See Clyburn v. News World Communications*, 903 F. 2d 29, 35 (D.C. Cir. 1990) *Zerilli v. Smith*, 656 F.2d 705, 714-715 (D.C. Cir. 1981); *Huitra*, 211, F. Supp. at 121-22; *Alexander v. FBI*, 1998 WL 1049005 at *1 (D.D.C. May 28, 1998); *Grunseth*, 868 F. Supp. at 335; *Liberty Lobby, Inc. v. Rees*, 111 F.R.D. 19, 22-23 (D.D.C. 1986).  It should be noted that in several of these cases there appear to have been a discrete or limited number of possible alternative sources for the information sought, either ascertainable directly from a news article or provided by a party, to which the party seeking disclosure

could be required to turn. *See, e.g. Zerilli*, 656 F.2d at 708 (Justice Department provided a list of employees who knew most about the information alleged to have been disclosed in violation of the Privacy Act, as well as a list of all government officials who had access to the information); *Huitra*, 211 F. Supp. at 122 (other individuals discussed in the article); *Liberty Lobby*, 111 F.R.D. at 22 (defendant revealed "numerous names individuals who purportedly had information about the alleged relationship," of which 10 or 12 remained alive); *Maughan v. NL Industries*, 524 F. Supp. 93, 94 (D.D.C. 1981) (plaintiffs were available for discovery and were sufficient source of information regarding when they became aware of facts at issue); *see also Carey v. Hume*, 492 F.2d 631, 638-39 (D.C. Cir. 1972) (privilege was *not* upheld where reporter provided only "vague" "guidemarks" as to who sources could be, and party seeking information therefore had "no reasonable basis to know where to begin"). Nevertheless, courts have found that the fact that a party "may have considerable difficulty obtaining the information . . . does not, however relieve . . . the party of [the burden] of trying initially to obtain the information elsewhere." *Huitra*, 211, F. Supp. at 122.

21

DOD asserts that the deposition of Ms. Jontz is not the only means available to plaintiff to obtain the identity of the person who disclosed the information in question to *Stars and Stripes*. DOD maintains that it has provided plaintiff with a "clear and alternate path" to obtain the information sought from Ms. Jontz by suggesting the deposition of Lt. Col. Michael B. Glenn, the personnel manager at the Marshall Center who oversaw the application process for the position for which plaintiff applied. According to defendants, Lt. Col. Glenn could provide plaintiff with information relating to the identities of persons who may have had knowledge or access to information alleged to have been improperly disclosed, as well as information regarding what documents may have contained the information in question. This information would in turn assist plaintiff in assessing whether the information disclosed in the article was contained within a "system of records." Alternatively, defendants suggest that plaintiff could serve written discovery requests for information within Lt. Col. Glenn's possession.

Plaintiff insists that it is unfair to require her to conduct extensive discovery in an effort to seek out the potential sources for the information contained in the *Stars and Stripes* article from a seemingly endless set of

22

possibilities, particularly where only Ms. Jontz and her anonymous sources are likely to have access to the information plaintiff seeks. She emphasizes that, in the cases cited by DOD for the proposition that depositions of numerous other witnesses was an acceptable alternative source, the number of potential alternative sources of information was significantly limited.

Plaintiff further contends that there is no reasonable alternative source for the information she seeks to obtain from Ms. Jontz. In support of this contention, plaintiff points to evidence submitted by defendant which suggests that Ms. Jontz knew of the information alleged to have been improperly disclosed *before* she contacted the Marshall center. *See* Kennedy Decl. ¶ 6 ("Ms Jontz told me that she had heard that Linda Tripp had applied for a position..."). She submits that, in light of this information, Lt. Col. Glenn's deposition, which would touch only on information available through the Marshall Center, cannot serve as a reasonable substitute for that of Ms. Jontz, because it could not reveal who Ms. Jontz spoke to before calling the Center. Furthermore, plaintiff emphasizes that the article itself refers to a "Pentagon spokeswoman," about whom an employee of the Marshall Center is unlikely to be able to provide information central to plaintiff's claim.

Without reaching the merits of plaintiff's arguments, the
fact remains that with the exception of deposing Lt. Col.
Glenn, plaintiff has not even attempted to obtain the
information requested from other sources, and therefore has not
met the exhaustion requirement set forth by relevant case law.
The D.C. Circuit has held that "efforts made by the litigants
to obtain the information from alternative sources is . . . of
central importance . . . reporters should be compelled to
disclose their sources only after the litigant has shown that
he has exhausted every reasonable source of information."
*Zerilli*, 656 F.2d at 713; *see also Hutira*, 211 F. Supp. 2d at
122; *Blumenthal v. Drudge*, 186 F.R.D. at 244.  The Circuit
stated in *Zerilli*[5] that "appellants cannot escape their
obligation to exhaust alternative sources simply because they
feared that deposing Justice Department employees would be
time-consuming, costly, and unproductive." *Id*.  When
considering what a reasonable burden to impose on the Plaintiff

---

[5] In *Zerilli*, the plaintiffs alleged that Justice Department employees
violated the Privacy Act by leaking private information, in the form of
transcripts of conversations during which the plaintiffs allegedly discussed
illegal activities, to *Detroit News* employees, and that this information was
then relied upon for a number of articles relating to organized crime in
Detroit. *Zerilli*, 656 F.2d at 706-707.  The plaintiffs in *Zerilli* sought to
discover the identity of the sources the *Detroit News* reporter relied upon
for the article, and the reporter asserted the "reporter's privilege." *Id*.
The Court found that, while the identity of the reporter's source was
"crucial to the to [the plaintiffs' case]," the First Amendment privilege
should apply unless the plaintiffs could prove that they had exhausted all
possible alternative sources of information. *Zerilli*, 656 F.2d at 714-715.

prior to compelling a reporter to disclose the reporter's source would be, the Circuit has suggested that the taking of 25 depositions would be a reasonable prerequisite to compelled disclosure. *Carey*, 492 F.2d at 639; *see also Zerilli*, 656 F.2d at 714 (suggesting that 60 depositions is a reasonable burden to impose on a Plaintiff).  Additionally, as a District Court within this Circuit stated in *Tavoulareas*, "making disclosure of sources the end point of discovery rather than the beginning serves that additional purpose of assuring a context in which the Court can meaningfully assess whether the identities of the sources are crucial, important, or even relevant to the plaintiff's case before issuing an order compelling their disclosure." 93 F.R.D. at 17.  Only when the journalist appears to be the only individual with the relevant and critical information has the journalist been required to disclose the source of the information. *See PPM America v. Marriott Corp.*, 152 F.R.D. 32, 34-36 (S.D.N.Y. 1993); *N.L.R.B. v. Mortenson*, 701 F. Supp. at 248.

Plaintiff has engaged in minimal discovery, choosing instead to directly seek Jontz' deposition.  While the Plaintiff submits that Jontz' deposition will "narrow some of the plaintiff's discovery," and that there is no one else with the access to the relevant information, *see* Pl.'s Notice of Filing,

25

Ex. D, the D.C. Circuit has summarily rejected these arguments in favor of upholding the "reporter's privilege." *See, e.g., Clyburn v. News World Communications, Inc.*, No. CIV.A.86-1149, 1988 WL 489658, at *7 (D.D.C. April 14, 1988) (stating that Plaintiff's futility argument is "without any legal basis"), *aff'd*, 903 F.2d 29 (D.C. Cir. 1990).  The DOD had identified Glenn, the personnel manager for the Directorate of the Conference Center at the Marshall Center, and whom the plaintiff has now deposed, as someone who may be able to assist the Plaintiff by identifying the names of individuals who may have had knowledge of Tripp's application. Since Ms. Jontz' motion for a protective order was filed, plaintiff has not informed the Court that this deposition was futile. Plaintiff could also depose employees in the DOD and Office of Personnel Management's personnel and records departments, as well as Marshall Center employees who have access to personnel files or employment applications, in an effort to determine who may have provided information to Jontz prior to her call to the Center.

It is therefore clear that plaintiff has not exhausted all reasonable alternative sources of information regarding Jontz' sources, and cannot, at this stage in the litigation, overcome Jontz' assertion of "reporter's privilege." Accordingly, the Court will grant the motion for a protective order. To be sure,

plaintiff remains free to seek reconsideration of the Court's Order upon completion of further discovery.

## III. Conclusion

Upon careful consideration of the pending motion for a protective Order [48-1], the responses and reply thereto, the governing statutory and case law, and the entire record herein, it is by the Court hereby

**ORDERED** that the motion is hereby **GRANTED**, and Ms. Sandra Jontz is entitled to invoke the reporter's privilege in response to plaintiff's discovery requests regarding her sources for the article at issue.

9 - 30 - 03

_____          _____

DATE                             EMMET G. SULLIVAN
                                 UNITED STATES DISTRICT JUDGE

27

Notice to:

Stephen M. Kohn, Esquire
David K. Colapinto, Esquire
Michael D. Kohn, Esquire
KOHN, KOHN & COLAPINTO, P.C.
3233 P Street, NW
Washington, DC 20007

Andrea Gacki, Esquire
U.S. DEPARTMENT OF JUSTICE
Civil Division
P.O. Box 883, Room 886
Washington, DC 20004
P.O. Box 14600
Washington, DC 20001